**Federal Defenders
OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

*David E. Patton*
Executive Director
*and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

July 31, 2023

Hon. John P. Cronan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY   10007

      Re: **United States v. Rodney Waggoner**
          22-Cr-557 (JPC)

Dear Judge Cronan:

      Rodney Waggoner begins each day by waking up his three-year-old son, ▇.  From that moment, the rest of Mr. Waggoner's day is devoted to his son: he cooks ▇ breakfast, potty trains him, teaches him the alphabet and the names of different animals, watches television with him, bathes him, and tucks him into bed.  ▇'s mother lives in a homeless shelter, and Mr. Waggoner's mother works long hours and cannot supervise ▇ during the day.  For Mr. Waggoner and ▇, father and son, their lives revolve around each other.

      In this respect – and others – being under home confinement for nearly eleven months has been a blessing in disguise for Mr. Waggoner.  Unable to leave his apartment, Mr. Waggoner, who is still just 26 years old, has used that time to reckon with the impact of his decisions and to change in truly meaningful ways.  Having previously struggled in school, he participated in educational programming.  With only sporadic work history, Mr. Waggoner – through the Focus Forward Project – completed a resume and learned interviewing and public speaking skills.  For the first time in his life, Mr. Waggoner set concrete, long-term goals for himself, and developed a plan to achieve those aspirations.  In group sessions and through daily journaling activities, he took stock of his poor choices and gained valuable insights.  And, as someone whose own lack of a father figure contributed so much to his struggles as a young adult, Mr. Waggoner committed to being an unwavering and loving presence in his son's life.

      Sending Rodney Waggoner to federal prison for this offense – which, although serious, involved no violence and resulted in no injuries – would not satisfy the purposes of criminal sentencing.  Rather, the Court should sentence Mr. Waggoner to time served, two years of supervised release, six additional months of home confinement, and community service.  Doing so would ensure that Mr. Waggoner faces consequences for his poor choices, while permitting him to continue pursuing his rehabilitative efforts and raising his three-year-old son.  Such a sentence would be sufficient, but not greater than necessary, in this case.

## I. FACTUAL BACKGROUND

### A. Mr. Waggoner's upbringing.

Rodney Waggoner was born to a 24-year-old single mother in a rough Harlem neighborhood in 1996. From his early childhood, young Rodney longed for a relationship with his father. His parents had separated before he was born, and for nearly a decade Rodney never even met his dad. Instead, Rodney knew only two things about his father growing up: that he had once run a trucking business, and that he was in prison.

With no support from Rodney's father, Rodney's mother, Suzanne Love-Waggoner, tried her best to provide for her son. As Ms. Love-Waggoner recalls, Rodney's father "was not there to help with money, with Rodney's homework, doctor's visits, or anything like that." Ex. B (Letter from Suzanne Love-Waggoner). As a result, she was forced to play "the role of both mother and father." Id. To keep the family afloat, Ms. Love-Waggoner worked long hours with the United States Postal Service, and was often forced to leave Rodney in the care of his great-aunt and great-uncle. Although his relatives brought him to amusement parks and tried to provide a carefree environment, Rodney found it very difficult to cope with growing up fatherless. Ms. Love-Waggoner recollects that Rodney "would constantly ask me about his dad." Id.

Hoping to form some kind of connection between Rodney and his absent father, Ms. Love-Waggoner began allowing Rodney to spend weekends with Risse Lane. Ms. Lane had once been in a relationship with Rodney's father, and was the mother of Rodney's half-sister, Sade Brown. Rodney developed a close relationship with Sade, and began to treat Ms. Lane as his "second mom." Ex. B (Letters from Risse Lane and Sade Brown). Nevertheless, "it was hard for Rodney to grow up without his father around. He grew up with two moms, but there are things you absolutely need from a father." Ex. B (Letter from Risse Lane).

Rodney's father was released from prison when Rodney was six years old, and was "not in the picture until Rodney was about 9." Ex. B (Letter from Suzanne Love-Waggoner). According to Ms. Lane, when "his father did come into his life, it was not easy especially at first." Ex. B (Letter from Risse Lane). The circumstances of his father's appearance must have been astoundingly jarring for nine-year-old Rodney: one day, there was a knock at the front door; a man stood outside, and Rodney's mother told him, "That's your dad." Rodney longed to form a meaningful relationship with his father, but was denied "some kind of positive male figure as a kid, someone who truly cared." Ex. B (Letter from Risse Lane). Instead, his father was only a sporadic presence in his life, dropping by every now and then to take him to the movies or out to eat, but providing no child support. Ex. B (Letters from Suzanne Love-Waggoner and Risse Lane).

In an effort to give Rodney structure and to shield him from the negative influences of the neighborhood, Ms. Love-Waggoner enrolled him in private Catholic school. Rodney initially enjoyed going to class, had a lot of friends, and was known as "the jokester kid, the one that everyone likes." Ex. B (Letter from Suzanne Love-Waggoner). In the seventh grade, however, Ms. Love-Waggoner became unable to afford the school's tuition and had to transfer Rodney into the public school system. Struggling to fit in in a rougher environment around "different kinds of kids than he was used to," things "started to go downhill" for Rodney. Id. He found himself thrust into an environment marred by "a lot of violence and drug abuse and distribution right in front of your face," the "kind of environment where the youth feel they have nothing but gangs." Ex. B (Letter from Risse Lane).

Since Rodney refused to join a gang himself, his schoolmates began jumping him, beating him up, and stealing his bookbag and belongings. As he recounts, "at school, outside of school, and everywhere I turned, I saw people get robbed and beat up. Growing up, things were crazy. I've even been chased by people who want to hurt me." Ex. A (Letter from Rodney Waggoner).

In such a physically intimidating environment, and still lacking a stable and reliable father figure, Rodney struggled in school. He kept up with assignments but found it difficult to focus and excel academically. Pushed through the school system, Rodney managed to graduate high school on time with a 67.5 GPA. PSR ¶ 59.

When he graduated high school, Rodney had dreams of going to college. He knew, however, that as with private Catholic school, paying the tuition would be impossible. With limited job prospects, and feeling more and more like his life was not living up to his dreams, Rodney lost his way. He began drinking and was adjudicated a youthful offender in two misdemeanor cases. Then, just two months after his twentieth birthday, Rodney sustained his only prior criminal conviction: he pled guilty to second-degree assault after an incident in which he drunkenly punched someone outside a liquor store when he was nineteen years old. He received a harsh sentence: at 20 years old and with no criminal record, Rodney was sentenced to three years in state prison.

For a young man like Rodney – barely older than a teenager, and having spent his formative years on the receiving end of bullying and violence – the transition to state prison was traumatic. A twenty-year-old surrounded by hardened criminals, Rodney found it difficult to cope with his new circumstances. He never acted violently or had any violent disciplinary sanctions; however, he began smoking synthetic marijuana in a misguided attempt to dull his increasing anxiety. Following a disciplinary sanction for possessing marijuana, he addressed his issues head-on: he stopped smoking and completed the ASAT program to address his previous alcohol use. Ex. E.

Mr. Waggoner was released from state prison at 22 years old. Shortly after his release, he met Keyana Laureano, the sister of a friend. The two fell in love, and in 2020, their son, ▬, was born. Determined to provide ▬ the love and support that his own father had denied him, Mr. Waggoner "stepped up to being a father." Ex. B (Letter from Keyana Laureano). As Ms. Laureano now notes, Mr. Waggoner "has consistently shown unwavering dedication to our child and immense love for him." Id.

As a young man saddled with a criminal record, however – and having spent three of the most important foundational years of his life behind bars – Mr. Waggoner struggled to provide a financially stable life for his partner and son. He graduated from an anger management program, earned his flagger's license and his 10- and 30-hour OSHA certificates, and completed three years of post-release supervision without any violations, but finding a job proved nearly impossible. PSR ¶ 40, 60-63; Ex. B (Letter from Suzanne Love-Waggoner). Although he "signed up for jobs and programs . . . many doors were shut in his face." Ex. B (Letter from Suzanne Love-Waggoner). Mr. Waggoner eventually found employment as a part-time flagger, but the work was sporadic and he was financially unstable. PSR ¶ 62-63. He tried to move out of his mother's apartment and start a home with his partner and son, but the young family wound living in a shelter, and Mr. Waggoner ultimately moved back into Ms. Love-Waggoner's home with his son. PSR ¶ 52.

Making matters worse, Mr. Waggoner continued to be the victim of unrelenting violence in his neighborhood. In one incident, Mr. Waggoner took his younger half-brother to a local pool. As

they came out of the pool, they were chased by a group of men wielding machetes; Mr. Waggoner grabbed his half-brother by the hand and the pair ran for their lives, narrowly escaping injury or worse. Ex. B (Letter from Risse Lane). In another ordeal, Mr. Waggoner was waiting at a bus stop when he was accosted by a group of men, one of whom wielded a gun. The men beat and robbed him, and Mr. Waggoner was left not only in severe physical pain, but also with the sense that he could not walk the streets safely – that every time he left his home he faced the strong possibility that his son would grow up without a father. Financially struggling, under emotional stress, and the victim of recurring violence in the community, Mr. Waggoner hit rock bottom.

On June 2, 2022, Mr. Waggoner went to a nightclub. Worried about being victimized late at night in his rough neighborhood yet again, Mr. Waggoner made a deeply regrettable decision: he decided to bring a gun for protection. The gun – which he had kept locked far from his son's reach – was discovered by a security guard during a patdown outside the club. Mr. Waggoner never took it out, brandished it, or fired it, and no one was hurt.

Mr. Waggoner's arrest broke his mother's heart. She was not only supremely disappointed in him; she also became anxious about his future, worrying that Mr. Waggoner's son was going to "become another statistic of a fatherless child being raised by the streets." Ex. B (Letter from Suzanne Love-Waggoner). Mr. Waggoner saw the toll his actions had taken on his family, and never tried to make excuses for his behavior. Instead, on February 1, 2023, just a few months after the instant federal charges were filed, Mr. Waggoner pled guilty and accepted responsibility for what he had done.

### B. Mr. Waggoner's growth during home confinement.

Mr. Waggoner has been under home confinement since his federal case commenced last September. Although obviously preferable to jail, home confinement has been far from a walk in the park. For nearly a year, Mr. Waggoner has been confined to his mother's small, "railroad-layout" apartment. PSR ¶ 53. He spent the first six months of this case subject to home incarceration, meaning he was not permitted to leave for any reason other than court dates, medical appointments, and, with the Court's approval, his beloved aunt's funeral. In March of 2023, given Mr. Waggoner's compliance with home incarceration, the Court modified the release conditions to home detention: although he could now obtain Pretrial Services' permission to leave for reasons like religious services or childcare obligations, Mr. Waggoner was still, for most purposes, unable to walk out his own front door.

Mr. Waggoner's arrest and home confinement were a wakeup call. Still just in his mid-twenties, Mr. Waggoner used the last year to sincerely change, and to begin to take the steps needed to be a fully productive member of society. First and foremost, Mr. Waggoner stepped up to his parental responsibilities. With Ms. Laureano still living in a homeless shelter, and wanting to shield his son from growing up in such an environment, Mr. Waggoner threw himself into being a devoted full-time father. As Ms. Love-Waggoner describes, "Rodney is the primary caretaker of ▮▮▮ now since has been on house arrest and this is the only thing that has made this experience goes from lemons into lemonade":

> Rodney has truly realized what being a father entails. Since his own father wasn't there for him growing up, Rodney has stepped up more to the role for his young son. He literally does everything for ▇, from the time he wakes up until the time he goes to bed. Rodney teaches him, for example, by going through little animal cards with ▇ to learn the names of the animals. He reads to him and cooks for him: breakfast, lunch, and dinner. He bathes him and puts him to bed . . . . The bond that Rodney and ▇ have makes my heart smile. I really am proud to see Rodney stepping up that way.

Ex. B (Letter from Suzanne Love-Waggoner). Other family members have noted this bond as well. Ms. Lane writes that Mr. Waggoner "does everything for ▇," "his son is absolutely smart because of him," and the "saddest thing would be for Rodney to be separated from his son." Ex. B (Letter from Risse Lane). Sade Brown emphasizes that Mr. Waggoner has taught ▇ "everything, from knowing how to hold his own bottle to learning the alphabet and now even potty training; I've never seen my brother be so hands on." Ex. B (Letter from Sade Brown) She adds that Mr. Waggoner "broke a generational curse because my father didn't do that with neither one of us." Id. And according to ▇'s mother, Ms. Laureano:

> Rodney takes ▇ to the park whenever he can. He teaches him his ABCs, how to count, and helps with potty-training. ▇ sees Rodney every day. Rodney likes to play with him using Legos and watches movies with him. Rodney also cooks him breakfast and dinner and puts him to sleep. ▇ loves and adores his dad so much. Rodney's commitment to being a supportive and caring father is truly commendable.

Ex. B (Letter from Keyana Laureano).

In his letter to the Court (attached as Exhibit A), Mr. Waggoner details what a typical day on home confinement looks like, and unsurprisingly his revolves around an unwavering devotion to his son:

> [▇ and I] usually wake up at 7 or 8 and go straight to the potty and use the bathroom together because I'm potty training him now. I always congratulate him when he uses the potty because I learned that he's happy when people are proud of him. After that, I go make him some oatmeal or some pancakes. We eat a breakfast for champions, then we start school time. We sit down in the living room and play with his alphabet and number blocks. After our learning time, I let him watch some Mickey Mouse or other shows, and I put him down for a nap. In the evening, I make him dinner, give him a bath, dry him off, change his diaper, and finally put him to bed.

Being on home confinement has helped Mr. Waggoner find his purpose: breaking a "generational curse" and giving ▇ the strong father figure that Mr. Waggoner never had.



Coming to understand the impact of his poor decision on his family – and the way his actions have jeopardized not only his own future, but also his son's – has been more life-changing for Mr. Waggoner than a day in prison ever could be. He carries the weight of the knowledge that Ms. Lane emphasizes in her letter to the Court: "the cycle will just repeat itself if Rodney goes to prison and ▬ doesn't have his dad around." Ex. B (Letter from Risse Lane). Indeed, as Sade Brown has witnessed, "when Rodney stare in his son eyes now it makes him break down because he just wants the best life for him, and he knows that the decisions he make affects all of us but especially his child." Ex. B (Letter from Sade Brown).

Mr. Waggoner's growth and rehabilitation while on home confinement has extended beyond raising his son. He has taken steps to improve himself and put himself on the path to being a productive member of society. Looking for "something of meaning to do" while confined to his apartment, Mr. Waggoner started keeping a journal and reading, no small achievement for someone who narrowly graduated high school. Ex. B (Letter from Suzanne Love-Waggoner). He focused on a set of career interests and developed long-term goals: in addition to aspiring to earn a commercial driver's license, Mr. Waggoner gained skills as a cook and has expressed interest in "trying to be a chef." Ex. A; Ex. B (Letter from Sade Brown). Mr. Waggoner has taken to cooking for his family, and on Mother's Day this year – unable to leave the home to buy a gift – Ms. Love-Waggoner recalls

that he made her "chocolate-covered strawberries because he wanted to give me something just to let me know he appreciates me." Ex. B (Letter from Suzanne Love Waggoner).

And Mr. Waggoner has taken concrete steps to make his goals a reality. He connected with the Federal Defenders' Social Work Department, which has developed a reentry plan for him to implement after his home confinement ends that is focused on vocational training. Ex. D. Moreover, Mr. Waggoner enrolled in and successfully graduated from the Focus Forward Project, a twelve-week program "dedicated to providing an educational curriculum focused on reentry for individuals charged with federal crimes." Ex. C. Through Focus Forward, Mr. Waggoner completed weekly reading, journal, and homework assignments, developed reading comprehension skills, and gained tools like "a completed resume, interview skills, conflict resolution skills, public speaking skills, and the setting of both short and long-term goals." Ex. C. Mr. Waggoner's class facilitators describe him as an active participant who had an "outgoing personality, listening skills," and candor in sharing "some very difficult life experiences." Ex. C. Notably, Mr. Waggoner did all of this with no promise of leniency; he has actively sought opportunities to change, to mature, and to ensure that – still just 26 years old – his future decisions are much different than those he made in the past.

Finally, Mr. Waggoner used his time on home confinement to really reckon with his decisions and learn from his mistakes. As his class facilitators at Focus Forward emphasize in their detailed submission to the Court, Mr. Waggoner took time in his group sessions to express his "great regret about the pain and suffering his past bad decisions have caused his mother," and his commitment to "stay on the right path" so he could "'do right by her' in the future." Ex. C. And Mr. Waggoner's sincere letter to the Court describes how his time on home confinement provoked him to "look at reality" and learn a valuable lesson:

> I need to place myself in different environments, be with different people, do different things. As much as I can control, I shouldn't be anywhere that I feel I need a gun. If I feel something is unsafe, I should just not go. What I've learned from this experience is I don't need a gun, I need my mind. Choose different environments, stay home more, get a job, stay busy, and if I feel something is not safe and I'm scared, just don't go. Being in the house for so long have really open my eyes and my mind.

Ex. A.

### C. The Guidelines calculation and the Probation Department's recommendation.

In its presentence report, the Probation Department calculated Mr. Waggoner's advisory sentencing range as 30 to 37 months' imprisonment. PSR at 23. This was based on an error regarding whether his previous conviction at 20 years old qualifies as a "crime of violence." As explained in the separate defense submission filed today with the Court, Mr. Waggoner's correct advisory sentencing range should be 8 to 14 months' imprisonment, located in Zone B of the Guidelines sentencing table. ECF No. 30.

Nevertheless, even with its miscalculation, Probation recommended a downward variance of 20%, to 24 months' imprisonment. Probation noted that Mr. Waggoner "experienced some

difficulties during his childhood," including having an absentee father; is only 26 years old and spent several years in state prison at a "young age"; is a "high school graduate who has a very stable residence"; is the "primary caretaker for his three-year-old son"; and has a support network. PSR at 24.

### II. THE APPROPRIATE SENTENCE IN THIS CASE IS TIME SERVED, TWO YEARS OF SUPERVISED RELEASE, SIX MONTHS OF HOME CONFINEMENT, AND COMMUNITY SERVICE.

Although the Court must consider the advisory Guidelines sentencing range, the "Guidelines are guidelines – that is, they are truly advisory." United States v. Dorvee, 616 F.3d 174, 183 (2d Cir. 2010) (citations omitted). "Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant." Id. at 182. Rather, the Court must conduct an "independent review of the § 3553(a) sentencing factors." Id.

Under 18 U.S.C. § 3553(a), the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of criminal sentencing. Since courts must "consider every convicted person as an individual," the sentence imposed must "fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (citations omitted). As such, the Court must evaluate factors including, among other things, the "nature and circumstances of the offense and the history and characteristics of the defendant"; "the need to avoid unwarranted sentencing disparities"; and the need for the sentence to provide just punishment, afford adequate deterrence, and protect the public. 18 U.S.C. § 3553(a)(1)-(7).

Here, considering Mr. Waggoner's background, the circumstances of the offense, his sincere remorse, his remarkable growth during his year of pre-trial home confinement, and his role as the primary caretaker for his three-year-old son, a non-incarceratory sentence of time served, two years of supervised release, six months of continued home confinement, and community service, is sufficient but not greater than necessary. Such a sentence would ensure that Mr. Waggoner faces real consequences for his poor decision-making, while allowing him to continue his rehabilitation, pursue further programming that will prevent him from any future recidivism, and maintain an active presence in his young son's life.

#### A. Mr. Waggoner's history and characteristics support a non-incarceratory sentence.

Mr. Waggoner's history and characteristics militate strongly in favor of a non-incarceratory sentence including a period of home confinement. As he has demonstrated throughout the last year, Mr. Waggoner is someone who is capable of changing, learning from his mistakes, and leading a productive, law-abiding life. A prison term is simply not necessary in Mr. Waggoner's case; in fact, such a sentence would only serve to derail Mr. Waggoner's positive growth.

As detailed above and in the numerous letters of support submitted to the Court, Mr. Waggoner's life did not get off to a promising start. He was raised by a single mother in a neighborhood marred by violence, drug distribution, and gang activity; he had no stable male role model to look up to; he was a victim of bullying and violence in school; he struggled academically; he fell into drinking as a teenager to cope. By the time he was nineteen years old, Mr. Waggoner's prospects for the future were dim: he had no hope of affording a college education, limited job prospects, and a teenager's reduced capacity to set long-term goals.

-8-

And then, at barely twenty years old, Mr. Waggoner was sentenced to a term in state prison. It is well-known that prison has a devastating impact on the lives on young people in the "transitional period" of 16 to 24 years old, as Mr. Waggoner was.  See Laurence Steinberg et al., Reentry of Young Offenders from the Justice System: A Developmental Perspective, Youth Violence Juv. Justice, Jan. 2004, at 2(1): 21, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2813457/.  For young people in that age range, being incarcerated "all but preclude[s] the facilitation of psychosocial development"; leaves them "ill-equipped to manage adult roles and responsibilities"; and precludes their "eligibility for a variety of careers."  Indeed, "the context of the justice system is one that is more likely to arrest [young peoples'] development than promote it."  Id.  Mr. Waggoner was no exception: he developed, and then needed to overcome, a drug issue in order to cope with his violent and dangerous surroundings; he lost any sense of self-worth that remained; he left prison as a 22-year-old who was effectively unemployable, reduced to living in a homeless shelter and unable to financially support his partner and infant son.  His incarceration as a young man was, in short, a devastating setback reinforcing the scientific fact that "young offenders finish their time with the justice system and move into the adult world with just as many, if not more, problems than when they first entered." Id.

At the time of his arrest in this case, Mr. Waggoner was someone who, through the combination of a difficult upbringing and incarceration as a young man, had completely lost his way. But being charged with a federal crime and placed under house arrest served as a much-needed wakeup call.  Now 26 years old and with a son to take care of, Mr. Waggoner resolved to grow, change, and start building a life for himself.  More than anything else, it is his remarkable conduct during the last year that demonstrates why Mr. Waggoner is a deserving of a non-incarceratory sentence, and a strong candidate for a period of home confinement rather than imprisonment.

First, Mr. Waggoner – with no promise of leniency – chose to enroll in programming designed to help him overcome the obstacles that had contributed to his poor choices.  Through the Focus Forward Project, Mr. Waggoner participated in a structured educational curriculum, and was a valuable contributor to his class.  He completed weekly homework assignments and took up keeping a daily journal, something his family recognized was a meaningful and rewarding experience for him.  He developed reading comprehension skills, an important step toward future employability for someone who had struggled in school.  And he gained important experience for future job searches: he completed a resume, learned interview skills, and practiced public speaking.  With a confidence he had never before possessed, Mr. Waggoner connected with the Federal Defenders' Social Work Department, which has developed a plan for him to enter vocational programs tailored to his specific interests.

Second, Mr. Waggoner used his time under home confinement to reflect on his actions and gain important insights into his poor decisionmaking.  The Focus Forward team noted Mr. Waggoner's profound self-reflection and his "great regret about the pain and suffering his past bad decisions have cause his mother."  Ex. C.  His entire family has observed Mr. Waggoner's grief over the fact that his actions could result in his son spending years without a father – the kind of childhood Mr. Waggoner himself endured.  And analyzing the reasons he committed this crime, Mr. Waggoner came to see the errors in his judgment; indeed, in his letter to the Court, Mr. Waggoner shows that he developed a genuine understanding of the appropriate way to resolve situations in which he fears being the victim of violence.  Ex. A.

-10-

Third, Mr. Waggoner has admirably and unwaveringly devoted himself to raising his three-year-old son, ███, while on home confinement. Terrified of subjecting ███ to the same traumatic youth he himself endured as a child with an imprisoned father, Mr. Waggoner – who is ███'s primary caretaker – has become a constant and unconditionally loving presence for his son. From the moment they first wake up, through home schooling and cooking and potty training, to the time when they fall asleep in each other's arms, Mr. Waggoner and ███ are together. Were Mr. Waggoner sent to prison, no one would be able to provide ███ with such a loving and supportive environment: Mr. Waggoner's mother works long hours, and ███'s mother lives in a homeless shelter.

And fourth, Mr. Waggoner has shown that he is capable of complying with a sentence of home confinement and putting that time to productive use. Unlike his previous term of imprisonment, which was imposed when he was merely twenty years old and did not have a son to care for, being given the opportunity to await his sentence while under home confinement has led Mr. Waggoner to make such substantial positive strides. He adjusted admirably to the difficulties of home confinement: according to Pretrial Services, he had only a few late arrivals caused by a long wait at his barbershop, had no violations, committed no new crimes, and remains in compliance with the terms of his location monitoring. Probation has conducted a home visit and determined Mr. Waggoner's residence is stable, and noted his family support as a factor supporting a downward variance from the Guidelines.

Mr. Waggoner, in short, has shown that people truly can grow and change without being sent to prison. For someone with Mr. Waggoner's background and circumstances, who has made such positive strides that would be derailed by a term of imprisonment, a sentence of time served, two years of supervised release, six months of home confinement, and community service is an appropriate sentence. It would be sufficient, but not greater than necessary, in this case.[1]

### B. **A non-incarceratory sentence is appropriate in light of the nature and circumstances of the offense.**

Mr. Waggoner's conduct was undoubtedly serious. But in considering the nature and circumstances of the offense, as the Court is required to do, there are several factors that militate in favor of a non-incarceratory sentence.

First, the incident did not involve any violence. Although he possessed a gun, Mr. Waggoner did not take it out, brandish it, or fire it. No one was hurt; indeed, no one was even threatened, and the gun was found during a patdown by a security guard. Therefore, while Mr. Waggoner's is a "gun case," it is a far cry from the types of cases that typically result in prison sentences.

Second, Mr. Waggoner committed this offense after enduring years as a victim of unrelenting violence in his community. Starting when he was just a child, Mr. Waggoner was beaten up and bullied for refusing to join a neighborhood gang. As an adult, he was robbed at gunpoint and beaten at a bus stop; he was chased by machete-wielding men at a local pool and had to race to safety with his younger half-brother. Mr. Waggoner lived in fear of violence every day, and this fear led him to

---

[1] Mr. Waggoner is statutorily eligible for a sentence including a period of home confinement. Moreover, as explained in the defense's submission regarding Probation's Guidelines calculation, Mr. Waggoner's correct advisory sentencing range is 8 to 14 months. ECF No. 30. He thus falls in "Zone B" of the sentencing table, within which the Guidelines support the imposition of a term of supervised release with home confinement in lieu of imprisonment. U.S.S.G. § 5C1.1(c)(2).

make the remarkably poor decision to carry a gun in self-defense.  None of this is meant to excuse Mr. Waggoner's behavior; indeed, he has never tried to excuse it himself.  But it does help to explain how he wound up making the regrettable choice that he did.

And finally, Mr. Waggoner has shown genuine remorse for his bad decisionmaking.  By meaningfully engaging in group sessions with the Focus Forward Project and taking time while on home confinement to evaluate his choices, Mr. Waggoner has recognized that his decision was wrong and gained insights that ensure he will never commit such an act again.  He accepted responsibility just a few months after being charged, and his letter to the Court demonstrates that he truly has learned the right way to deal with situations in which he is worried about being victimized: "Choose different environments, stay home more, get a job, stay busy, and if I feel something is not safe and I'm scared, just don't go."  Ex. A.

This case is, to put it simply, not one in which imprisonment is either necessary or appropriate.  Indeed, even Probation recognizes that a variance from the draconian Guidelines sentencing range is warranted in light of Mr. Waggoner's background.  A sentence involving supervised release, an additional six months of home confinement, and a substantial amount of community service would ensure that Mr. Waggoner faces real consequences for his actions, while also reflecting that those actions did not occur in a vacuum and no one was harmed.  Such a sentence would thus strike the balance demanded by 18 U.S.C. § 3553(a) to ensure that punishment is sufficient, *but not greater than necessary*.

### C.  **A non-incarceratory sentence would satisfy the purposes of criminal punishment.**

Mr. Waggoner has already spent nearly eleven months on home confinement, during which he has shown serious growth and maturity.  There is no reason to believe that a term in a federal prison is necessary.  Rather, sentencing Mr. Waggoner to time served, six additional months of home confinement in lieu of prison, community service, and supervised release, would satisfy the purposes of criminal punishment.

First, a non-incarceratory sentence with an additional period of home confinement and community service would be sufficient to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment."  18 U.S.C. § 3553(a)(2)(A).  Such a sentence would be far from a "slap on the wrist."  Home confinement is a significant restriction on a person's liberty, so much so that both Congress and the Sentencing Commission have equated it with imprisonment.  See 18 U.S.C. § 3563(b)(19) (home detention may be imposed as a condition of probation "only as an alternative to incarceration"); U.S.S.G. § 5C1.1(e)(3) (one day of home detention is equal to one day of imprisonment); id. § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment"); United States v. Fiume, 643 F. App'x 25, 28 (2d Cir. 2016) ("Home detention is a distinct condition that is significantly more onerous than GPS monitoring").  Although certainly preferable to the dysfunction and violence of a federal jail, the last year of home confinement has seen Mr. Waggoner confined to a small Harlem apartment,

-12-

unable to leave his own front door without permission. Notably, not a single day of the nearly eleven months Mr. Waggoner's liberty has been restricted thus far will count toward a prison sentence.[2]

A period of continued home confinement, along with community service and a term of supervised release under the watchful eye of the United States Probation Office, will impose real costs on Mr. Waggoner, ensuring that he is adequately punished for his behavior. At the same time, it will ensure that his growth – and his parental responsibilities – are not interrupted by the imposition of unnecessary time in a prison cell. This is especially true given the nature and circumstances of the offense outlined above, which did not involve the actual use of the gun in question.

Second, such a sentence would "afford adequate deterrence" and "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B), (C). Imposing an additional six months of home confinement – along with the eleven months Mr. Waggoner has already served – will result in him being off the streets for seventeen months. Home confinement has already proven to be a strong deterrent for Mr. Waggoner, who has not engaged in even a hint of criminal behavior and has had no violations. Additionally, Mr. Waggoner will be subject to years of supervised release, under which his compliance with laws will be closely monitored by a federal probation officer. In short, as Mr. Waggoner has shown during the last year, prison is not necessary from a deterrence perspective; home confinement is sufficient and, given his parental responsibilities and efforts at rehabilitation, not greater than necessary.

And finally, a non-incarceratory sentence would provide Mr. Waggoner with the opportunity for "needed educational or vocational training." 18 U.S.C. § 3553(a)(2)(D). Mr. Waggoner has already used the last eleven months on home confinement to enroll in educational and vocational programming, and the Federal Defenders' Social Work Department has developed a reentry plan that he can implement as soon as his period of home detention has ended. He will also have the support and resources of the United States Probation Department, which will doubtless provide him with programming and job referrals. Ensuring access to educational and vocational training is the very purpose of supervised release, Johnson v. United States, 529 U.S. 694, 709 (2000). A term in federal prison – with its lockdowns and limited program offerings – would not promote Mr. Waggoner's continued educational or vocational training. Rather, throwing Mr. Waggoner into a federal prison would likely increase, rather than reduce, his risk of future recidivism.

### D. A non-incarceratory sentence would not create unwarranted sentencing disparities.

Sentencing Mr. Waggoner to time served, two years of supervised release, community service, and six months of home confinement – on top of the eleven months of home confinement he has already served – would not create unwarranted sentencing disparities. Such non-incarceratory

---

[2] If the Court were to impose a prison term, it should grant a variance to reflect the nearly eleven months Mr. Waggoner has already served on home confinement. As discussed, that confinement – including six months of strict home incarceration – was a substantial restriction on his liberty tantamount to incarceration. The BOP will, however, not credit Mr. Waggoner with any of that time toward his sentence. Although federal defendants do not receive credit from the BOP for time spent on home detention, credit is the norm in several states. See Kate Weisburd, Punitive Surveillance, 108 Va. L. Rev. 147, 181 & n.211 (2022) (collecting cases).

sentences are frequently imposed in gun cases in this District, particularly in cases – like Mr. Waggoner's – where the gun was merely possessed and not used.  See, e.g., United States v. Minaya, 19 Cr. 487 (CM), ECF Nos. 30-31 (Oct. 14, 2021) (time served [no jail time] followed by three years' supervised release); United States v. Figueroa, 18 Cr. 293 (ER), ECF No. 44 (Apr. 17, 2019) (time served [no jail time] followed by one year of home detention and three years' supervised release); United States v. Garcia, 18 Cr. 178 (AT), ECF No. 50 (Mar. 7, 2019) (time served [no jail time] with inpatient treatment and three years of supervised release); United States v. Sanchez, 17 Cr. 303 (VM), ECF Nos. 5, 22 (Oct. 24, 2017) (time served [no jail time] followed by seven months' home confinement and three years' supervised release); United States v. Mouzon, 16 Cr. 284 (CM), ECF No. 53 (Mar. 27, 2017) (time served [no jail time] with 18 months' home detention and three years of supervised release); United States v. Goodman, 16 Cr. 693 (PGG), ECF No. 20 (Feb. 10, 2017) (time served [no jail time] with two years of supervised release including community service).[3]

### III.   CONCLUSION

The Court is tasked with imposing a sentence that is sufficient, *but not greater than necessary*. During his nearly eleven months on home confinement, Mr. Waggoner – still just 26 years old – has shown remarkable growth and maturity, engaged in programming, and gained valuable insight, all while admirably acting as his three-year-old son's primary caretaker.  The Court needs to determine whether a term of imprisonment would do any good in this case.   Clearly, it would not.

As Mr. Waggoner's mother explains in her letter to the Court – and as Mr. Waggoner's own letter makes abundantly clear – the time he has spent on home confinement "has made him reevaluate his priorities in life and what truly matters."  Ex. A; Ex. B (Letter from Suzanne Love-Waggoner). It took some time for Mr. Waggoner to mature and to develop the necessary skills and insight to avoid the kind of behavior that has landed him in this situation.   But his arrest was a much-needed wakeup call: he enrolled in programming, abided by the terms of his home confinement, and devoted himself to being the kind of loving and devoted father that he himself was denied.  Rodney Waggoner has truly changed.  He should be permitted to remain in the community – under close supervision, and with a period of further home confinement – and to continue his positive growth.

We respectfully request that the Court sentence Mr. Waggoner to time served, two years of supervised release, six months of home detention, and community service.   Such a sentence would be sufficient but not greater than necessary in this case.

Sincerely,

Michael Arthus
Assistant Federal Defender
212-417-8760

cc. (by ECF): AUSA Ryan Finkel

---

[3] For the reasons stated in Mr. Waggoner's objections to the pre-sentence report, the Court should strike Appendix A from the PSR and give no weight to Probation's inclusion of data from the JSIN tool.   That data is statistically unreliable and factually irrelevant.  PSR at 21.  In any event, had Probation correctly calculated Mr. Waggoner's offense level as 9 and his criminal history category as III, JSIN would not have yielded any results due to an insufficient data set.